**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES AND CAROLINE THARP, On Behalf of Themselves and All Others Similarly Situated, | : : : : : : : : : : : : : : : : : : : : : : : : : : : | CASE NO. |
| | | CLASS ACTION COMPLAINT |
| Plaintiffs, | | |
| vs. | | |
| NATIONAL CITY CORPORATION, THE PNC FINANCIAL SERVICES GROUP, INC. PETER E. RASKIND, JON E. BARFIELD, JAMES S. BROADHURST, CHRISTOPHER M. CONNOR, BERNADINE P. HEALY, ALLEN H. KORANDA, MICHAEL B. McCALLISTER, PAUL A. ORMOND, GERALD L. SHAHEEN, RICHARD E. THORNBURGH, JERRY SUE THORNTON, and MORRY WEISS, | | |
| | | DEMAND FOR JURY TRIAL |
| Defendants, | | |

## INTRODUCTION

1.      This lawsuit is a class action on behalf of the public stockholders of National City Corporation ("NCC" or the "Company") against NCC, its Board of Directors (the "Board"), and its merger partner The PNC Financial Services Group, Inc. ("PNC"), arising out of Defendants' dissemination of a false and misleading proxy statement in violation of §§ 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder. In addition, Defendants breached their fiduciary duties in their frantic scramble to sell the Company to PNC through an unfair process and at the inadequate and unfair price of **$2.23 per share – a 19% discount** from NCC's closing price the day before the deal was announced (the "Acquisition").

2.      Since 2003, NCC's stock price traded significantly above **$30 per share** until July 2007 when Defendants' misconduct started to come to light and NCC's stock price began to fall, rather quickly, over the next year. By early October 2008, NCC's share price had plummeted to between $2 and $5 per share. Around the same time, the government announced a $250 billion banking investment plan (the "Troubled Assets Relief Program" or "TARP"). Defendants assumed NCC would receive some of this capital. They were mistaken. Because of Defendants' misconduct from the previous years through the present, the government saw fit to stay clear away from bailing out NCC from its self-created financial distress.

3.      After the government's announcement of TARP, Defendant Raskind participated in numerous discussions with Office of the Comptroller of the Currency ("OCC") Chair, John Dugan ("Dugan"), from October 14, 2008 to the date the deal was announced, October 24, 2008. In these conversations, Raskind learned that NCC would not be receiving a capital injection from the OCC under TARP. The Board panicked and rushed back to the table to negotiate a deal as quickly as possible on any terms.

4.      Defendants undertook a flawed sales process designed to favor themselves and Company insiders to the detriment of NCC's public shareholders, culminating in the sale of NCC to PNC at an inadequate and unfair price.  As a result of the Acquisition, Defendants will secure: (i) extinguishment of outstanding derivative suits charging Defendants with misconduct in connection with accounting violations, insider trading, and other breaches of fiduciary duties associated with the fall of the Company; (ii) a deeper pocket to indemnify themselves for any outstanding suits that will not be extinguished in the Acquisition; and (iii) tens of millions of dollars in insider benefits. According to one news report: "National City's top three executives could split at least $41 million in golden parachutes following the company's sale to PNC." According to another news report, Raskind (NCC's Chairman, President and Chief Executive Officer) alone stands to earn $22.3 million in cash, stock and other awards if the deal is consummated, including an $8 million severance payment.

5.      Although Defendants have a fiduciary duty to maximize shareholder value, they took actions designed to be sure this Acquisition would go through and agreed to merger terms that unreasonably hindered the possibility of a superior offer. For example, PNC was granted an option that would allowed it to earn a profit of up to $224 million if the Acquisition is not completed.

6.      To effectuate their goal, Defendants need to secure shareholder approval.  Thus, on November 24, 2008, the NCC Board together with PNC caused a proxy statement to be filed with the SEC and disseminated in connection with an upcoming special shareholder vote on December 23, 2008 (the "Proxy"). The preparation and dissemination of the false and misleading Proxy statement was intended to induce shareholder action which will result in substantial harm to plaintiffs and NCC's other shareholders.

7.     Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's shareholders. Plaintiffs, on behalf of the Class, seek only to level the playing field and to ensure that if shareholders are to be ultimately stripped of their respective equity interests through the Acquisition, that the Acquisition is conducted in a manner that is not overtly improper, unfair and illegal.  Alternatively, Plaintiffs seek to rescind the Acquisition.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1331, as plaintiffs' claims arise in part out of the laws of the United States, § 27 of the 1934 Act, § 14(a) and § 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  In addition, there is complete diversity between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.   This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.     Venue is proper in this District because defendant NCC is headquartered in Cleveland, Ohio, and thus a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  Additionally, one or more of the Defendants either resides in or maintains executive offices in this District.

10.     This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

11.     Plaintiffs James and Caroline Tharp own or control 252,304 shares of NCC common stock and have owned or controlled such shares continuously at all times relevant herein. Plaintiffs are citizens of Colorado.

4

12.     Defendant NCC is a Delaware corporation with its principal place of business located at 1900 East Ninth Street, Cleveland, OH 44114-3484.  NCC is one of the nation's largest financial holding companies, and was founded in 1845. The company operates through an extensive banking network primarily in Ohio, Florida, Illinois, Indiana, Kentucky, Michigan, Missouri and Pennsylvania, and also serves customers in selected markets nationally. Its core businesses include commercial and retail banking, mortgage financing and servicing, consumer finance and asset management.

13.     Defendant PNC is a Pennsylvania corporation with its principal place of business located at 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222-2707.

14.     Defendant Peter E. Raskind ("Raskind") is NCC's Chairman of the Board and has been since December 2007. Raskind is also NCC's Chief Executive Officer and has been since July 2007. Raskind is the President and a director of NCC and has been since December 2006. Raskind was NCC's Vice Chairman from December 2004 to December 2006 and Executive Vice President from 2000 to December 2004. Raskind owned 740,396 shares, including options for 452,779 shares of NCC stock as of March 7, 2008. Upon information and belief, Raskind is a citizen of Ohio.

15.     Defendant Jon E. Barfield ("Barfield ") is a NCC director and has been since 1998. Barfield is also a member of NCC's Risk and Public Policy Committee and has been since 2006 and a member of the Audit Committee and has been since 2005. Upon information and belief, Barfield is a citizen of Michigan.

16.     Defendant James S. Broadhurst ("Broadhurst ") is a NCC director and has been since 1996. Broadhurst is also Chairman of NCC's Audit Committee and a member of the Risk

5

and Public Policy Committee and has been since 2005. Upon information and belief, Broadhurst is a citizen of Pennsylvania.

17.      Defendant Christopher M. Connor ("Connor") is a NCC director and has been since 2002. Connor is also a member of NCC's Compensation and Organization Committee and has been since 2005. Upon information and belief, Connor is a citizen of Ohio.

18.      Defendant Bernadine P. Healy ("Healy") is a NCC director and has been since 2003. Healy was also a NCC director from 1995 to 2001 and from 1989 to 1990. Healy is a member of NCC's Compensation and Organization Committee and has been since 2006. Upon information and belief, Healy is a citizen of Ohio.

19.      Defendant Allen H. Koranda ("Koranda ") is a NCC director and has been since 2007. Prior to joining NCC in 2007, Koranda was Chairman and Chief Executive Officer of MAF Bancorp, Inc. from 1989 until its acquisition by NCC in September 2007, and Chairman and Chief Executive Officer of Mid America Bank, MAF Bancorp, Inc.'s banking subsidiary, from 1984 until 2007. Upon information and belief, Koranda is a citizen of Illinois.

20.      Defendant Michael B. McCallister ("McCallister") is a NCC director and has been since December 2006. Upon information and belief, McCallister is a citizen of Kentucky.

21.      Defendant Paul A. Ormond ("Ormond") is a NCC director and has been since 1999. Ormond is also Chairman of NCC's Compensation and Organization Committee and has been since 2005. Upon information and belief, Ormond is a citizen of Ohio.

22.      Defendant Gerald L. Shaheen ("Shaheen") is a NCC director and has been since 2001. Shaheen is also a member of NCC's Compensation and Organization Committee and has been since 2005. Upon information and belief, Shaheen is a citizen of Illinois.

23.      Defendant Richard E. Thornburgh ("Thornburgh") is a NCC director and has been since May 2008. Thornburgh also is Vice Chairman of Corsair Capital LLC, a private equity investment company with more than $1 billion invested in financial services companies worldwide, including banks, insurers, asset managers, and specialty lenders. One of these banks

6

is NCC. Pursuant to the terms of the merger and Corsair's amended agreement with NCC, Corsair's shares will be bought at a minimum $5 per share, not the $2.23 per share price common stock holders will receive. Upon information and belief, Thornburgh is a citizen of New York.

24.     Defendant Jerry Sue Thornton ("Thornton") is a NCC director and has been since 2001. Thornton is also a member of NCC's Risk and Public Policy Committee and has been since 2006 and a member of the Audit Committee and has been since 2005. Upon information and belief, Thornton is a citizen of Ohio.

25.     Defendant Morry Weiss ("Weiss") is a NCC director and has been since 1993. Weiss is also Chairman of NCC's Risk and Public Policy Committee and has been since 2007 and a member of the Risk and Public Policy Committee and Audit Committee and has been since 2005. Upon information and belief, Weiss is a citizen of Ohio.

26.     The Defendants named in ¶¶14-25 are sometimes collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

27.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with plaintiffs and the other public shareholders of NCC and owe them, as well as the Company, a duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure, as well as a duty to maximize shareholder value.

28.     Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control, or (ii) a breakup of the corporation's assets, or (iii) a sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled

7

to receive a significant premium.  To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

     (a)     adversely affects the value provided to the corporation's shareholders;

     (b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

     (c)     contractually prohibits them from complying with their fiduciary duties;

     (d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

     (e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

29.     In accordance with their duties of loyalty and good faith, Defendants, as directors and/or officers of NCC, are obligated to refrain from:

     (a)     participating in any transaction where the directors' or officers' loyalties are divided;

     (b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation;

     (c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders; and/or

     (d)     failing to inform shareholders of all material information regarding the transaction before requesting shareholder approval.

30.     Plaintiffs allege herein that Defendants, separately and together, in connection with the Acquisition, are knowingly and/or recklessly violating their fiduciary duties, including

8

their duties of loyalty, good faith and independence owed to plaintiffs and other public shareholders of NCC, or are aiding and abetting others in violating those duties.  The Individual Defendants stand on both sides of the transaction, are engaging in self-dealing and abusing their control of NCC, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by plaintiffs or the Class, and/or are aiding and abetting other Defendants' breaches.  As a result of Defendants' self dealing and divided loyalties, neither plaintiffs, the Company, nor the Class are being treated fairly in connection with the Acquisition.

31.     Defendants also owe the Company's stockholders a duty of truthfulness, which includes the disclosure of all material facts concerning the Acquisition and, particularly, the fairness of the price offered for the stockholders' equity interest.  Defendants are knowingly or recklessly breaching their fiduciary duties of candor and good faith by failing to disclose all material information concerning, among other things, the Company's true value, and/or aiding and abetting other Defendants' breaches.

32.     Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, independence and candor in connection with the Acquisition, and/or are aiding and abetting other Defendants' breaches, and have the burden of proving the inherent or entire fairness of the Acquisition, including all aspects of its negotiation, structure, price and terms.

### THE ENTIRE FAIRNESS STANDARD

33.     In any situation where company insiders stand on both sides of a challenged transaction, the entire fairness standard is implicated, and Defendants bear the burden of demonstrating the two basic aspects of ***fair dealing*** and ***fair price***.

34.     The concept of fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The concept of fair price relates

to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects and any other elements that affect the intrinsic or inherent value of a company's stock.

35.    The test for fairness is not a bifurcated one as between fair dealing and price. All aspects of fairness must be examined as a whole since the question is one of ***entire fairness***.

36.    To demonstrate entire fairness, Defendants must present evidence of the cumulative manner by which they discharged all of their fiduciary duties.  An entire fairness analysis then requires the Court to consider carefully how the board of directors discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price.

37.    The burden of proof may shift to the plaintiffs, however, only if Defendants can demonstrate an approval of the transaction by a truly independent committee of directors who have real bargaining power that can be exerted in dealings with a majority or controlling shareholder who does not dictate the terms of the merger, or the inclusion of a majority of the minority provision in the merger agreement.

38.    Because a number of Defendants do, in fact, stand on both sides of the Acquisition, the burden to prove the entire fairness of the Acquisition will remain with Defendants.

## CLASS ACTION ALLEGATIONS

39.    Plaintiffs bring this action individually and as a class action on behalf of all holders of NCC stock who are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

40.    This action is properly maintainable as a class action.

41.     The Class is so numerous that joinder of all members is impracticable.   The number of shares of common stock of NCC outstanding is over 648 million.   The number of shareholders of NCC is unknown, but likely numbers in the thousands, and includes investors spread across the country.

42.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

(a)     Whether Defendants violated §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by filing a materially misleading Proxy Statement;

(b)     Whether Defendants have engaged and are continuing to engage in a plan and scheme to benefit themselves at the expense of the members of the Class;

(c)     Whether Defendants have fulfilled, and are capable of fulfilling, their fiduciary duties to plaintiffs and the other members of the Class, including their duties of loyalty, due care, and candor, which include, in this instance, the duty to maximize shareholder value;

(d)     Whether Defendants have unlawfully employed lockup provisions in order to impede, thwart or prevent the successful emergence of any alternative bid for NCC shares that offers greater value to plaintiffs and the Class than does the Acquisition;

(e)     Whether Defendants are engaging in self-dealing in connection with the Acquisition;

(f)     Whether Defendants are unjustly enriching themselves and other insiders or affiliates of NCC;

(g)     Whether the Acquisition is entirely fair to the members of the Class;

(h)    Whether Defendants have disclosed all material facts in connection with the true value of the Company and the challenged transaction; and

(i)    Whether plaintiffs and the other members of the Class would be irreparably harmed if the Defendants are not enjoined from effectuating the conduct described herein.

43.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs have the same interests as the other members of the Class.  Accordingly, plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

44.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

45.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

46.    To the extent Defendants take further steps to effectuate the Acquisition, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## BACKGROUND TO THE PROPOSED BUYOUT

**The Rise and Fall of Subprime Mortgage Lending**

47.     The term " subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."[1]

48.     Between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.[2]

49.     Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to several factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.[3]

50.     In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans and allowing borrowers to finance a greater percentage of a home's

---

[1]   *See Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* 110th Cong. (2007) (Statement of Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.).

[2]   Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount,* Wall St. J., Dec. 5, 2006.

[3]   *See Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

value or to carry a higher debt load (e.g., "no money down").[4]

51.     In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.  Examples of typical subprime mortgages are: interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10 years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates.[5]  These novel terms combined with the lowered lending standards contributed to the likelihood that many borrowers would default.

52.     As a result of these various incentives for subprime mortgages, subprime mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.[6]

53.     Meanwhile, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased risks for borrowers and lenders in the overheated housing markets.[7]

54.     Then housing troubles emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on variable rate loans, including mortgage loans, to rise.

---

[4]  *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1; *see also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 17, 2006.

[5]  *See* Liz Moyer, *Beware the Interest-Only Mortgage,* Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity*, Wall St. J., April 19, 2006, at D1 *and* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[6]   *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[7] *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005.

55.     In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, issued new guidelines for mortgage lenders.[8]  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.[9]

56.     However, most subprime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."[10] Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired.  However, because housing prices were falling, borrowers could not readily re-sell the property for a profit when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

57.     As early as in the summer of 2005, the media forewarned of the subprime market's pitfalls. For example, a Pakistani publication, Dawn, on July 11, 2005, made the following prescient analysis:

> The [US] regulatory regime cannot address risk management issues raised by the explosive growth of the collateralized debt obligation (CDO) industry. The US regulatory regime measures CDO transactions in terms of their book value and not their risk but a 2005 Morgan Stanley study has shown that during 2003-2004 the book value of CDO transactions represented only about 40 per cent of their

---

[8]  *Id.*; *See also Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

[9]  *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29, 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[10]  *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount,* Wall St. J., Dec. 5, 2006.

risk adjusted value.

Greenspan warns that "understanding the credit risk profile of CDO tranches poses challenges to even the most sophisticated market participant." CDOs have the potential to act as mechanisms for crisis transmission—investment banks, insurance companies, hedge funds and pension funds have large CDO holdings— and the regulatory regime is not equipped to deal with such a situation. This is becoming an increasingly important concern as interest rates rise in America.

58.     In 2006, subprime mortgage exposure grew even riskier as lenders originated a large number of "liar loans" (no-documentation and low-documentation loans).  This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.[11] Mortgage industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases.[12]

59.     The recent subprime mortgage crisis began with mortgages that were loaned to subprime borrowers, borrowers with low-rated credit history.  The loans were then packaged into security and debt obligations and sold into commercial paper markets.  Mortgage backed securities are generally sold as commercial instruments, such as bonds and CDOs.  When the borrowers began to default on their mortgage payments, due to increasing interest rates, investment banks, such as NCC, began to feel the effects in the market for mortgage backed securities.

60.     As a supposed safeguard over the valuation of its financial instruments, the Company stated publicly its practices and procedures regarding risk management.  The Company's supposed internal controls to ensure appropriate valuations and adequate financial disclosures failed either through a deficient risk management structure or its lax implementation

---

[11]  Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.

[12]  *Id.*

or both. NCC's flawed design to protect the firm from these types of overly aggressive investment and business strategies reflected the failures of the Individual Defendants at every turn to prevent the Company's eventual collapse and forced sale.

**NCC and the Subprime Market**

61.     NCC provides a wide range of financial services. Some of those services include mortgage finance services. During times relevant hereto, the Individual Defendants directed NCC provide those services in connection with mortgages made to subprime borrowers.

62.     For years prior to the proposed sale of the Company, the Individual Defendants recklessly directed NCC to provide mortgage services in connection with subprime loans and to then inaccurately report the Company's resulting exposure. In fact, from 2002-2005, in the height of the mortgage boom, many of the Individual Defendants allowed home loans to comprise roughly half of NCC's $2 billion annual profits.

63.     Throughout 2006 and into 2007 – as the housing market soured - the Individual Defendants caused the Company to issue several public statements reassuring the public that loan quality of NCC loans was sound, when in fact it was deteriorating rapidly.

64.     In fact, the truth about NCC's exposure to the subprime market - and the resulting financial losses for loan originators as the housing market rapidly dropped – was concealed until October 24, 2007 when NCC issued an earnings press release. This press release shocked investors as shares fell from trading above $38 per share prior to the announcement to roughly $15 per share in January of 2008.  However, the full truth of NCC's dire loan portfolio slowly emerged over the next fiscal year, until exactly one year after the initial negative press release when NCC announced the sale of the Company for $2.23 per share.

65.     The Individual Defendants knew, consciously disregarded, or were reckless and grossly negligent in not knowing or should have known the following material adverse facts when causing or allowing NCC to issue false and misleading public statements:

(a)     NCC was substantially more exposed to the subprime market crisis than the Company had previously disclosed; and

(b)     As a result of the foregoing, NCC's reported earnings and business prospects were materially inaccurate because they materially understated and misrepresented the risk of subprime loans and NCC's loan loss reserves.

66.     The Individual Defendants' decision to push NCC deep into the subprime mortgage market with a reckless disregard to proper underwriting procedures and risk protection caused NCC to fall into financial disarray, and lead to the Acquisition.

**The Individual Defendants Entertain Offers for NCC**

67.     In early April of 2008, reports began to surface about a possible sale of NCC. It was later widely reported by *Reuters* and the *Wall Street Journal* that companies showing interest in NCC were KeyCorp, Fifth Third Bancorp, Wells Fargo, Scotiabank of Toronto, and U.S. Bancorp, among others.

68.     While the Individual Defendants were flirting with the idea of selling the Company in April 2008, analysts estimated "the company's worth to be $8 to $12 a share, while Citigroup analysts figure NCC is worth about $15 a share."  Despite the relatively large group of potential suitors, the Individual Defendants chose to entrench their positions at the Company and decided not to sell the Company.

69.     Instead, the Individual Defendants struck an agreement with private investors to obtain roughly $7 billion in capital. The agreements - each dated on April 20, 2008 or April 21,

2008 - provided for preferred shares of stock sold at $5 per share at a time when the market price for NCC common stock was over $8 per share.

70.     NCC's investment agreement with one particular investor requires special attention.  NCC's agreement with Corsair Capital LLC ("Corsair") provided that Corsair could place a director on NCC's Board of Directors. Ultimately, this director was defendant Thornburgh.

71.     Additionally, Corsair's amended agreement with NCC calls for the private-equity firm to recoup at the entire value of their $5 per share initial investment in the event NCC is sold for under $5 per share. Indeed, because of warrants Corsair holds in NCC, Corsair is expected to obtain more than $5 per share if NCC is sold.

72.     In a conference call with analysts shortly after public disclosure of the investment agreements, defendant Raskind stated that NCC "can now go back to playing offense, instead of just playing defense." That offense lasted at most another five months, before Raskind and the other Individual Defendants announced behind closed doors to other banks that NCC was, again, for sale.

73.     In late September and early October, the Individual Defendants revisited the possibility of selling the Company.  NCC was in a more difficult financial position than the last time the Individual Defendants considered selling the Company. However, the Individual Defendants did not operate effectively to sell the Company.

74.     On October 12, 2008, the Individual Defendants convened to discuss the fate of the Company. The Individual Defendants left that meeting determined to move forward without a merger.

19

**The Individual Defendants Race to Sell NCC**

75.     The following day, on Monday October 13, 2008, the government announced its plan to inject $250 billion of capital into the banking industry through a program called TARP - the Troubled Assets Relief Program.

76.     In telephonic, personal, and email conversations among and between Raskind, Dugan (the head of NCC's primary regulator, the OCC), and NCC's Board of Directors in the following days, the Individual Defendants were made aware that NCC should not expect to receive any financial assistance from TARP.   The Individual Defendants panicked and raced to sale the Company at fire sale prices.

77.     In the Individual Defendants' panic, they only called *three* financial institutions out of the ten to fifteen institutions that had recently been in contact with NCC *within the past month* to discuss a business combination.   Additionally, the Individual Defendants called a fourth institution to gauge potential interest in a transaction.   Calling only four institutions when a panicked Board of Directors is looking to sell is at best a deeply flawed sales process given the large group of financial institutions that had an interest in merging with NCC just a short time before the Individual Defendants agreed to the Acquisition.   The deeper implication, and the much more likely result, is that the Individual Defendants breached their fiduciary duties in an effort to sell themselves to any bidder that extended the Individual Defendants indemnity and other personal benefits not shared with the shareholders of NCC.

78.     Of the 25 largest banks in the United States of America, NCC was the only bank that did not receive funds from TARP.   In fact, when the Representative from Ohio, Steven C. LaTourette, asked the Treasury to provide records pertaining to NCC, and PNC's acquisition of

NCC, the Treasury stated that they were unable to find any record of an NCC application for funds under TARP.

79.     On or about October 22, 2008, PNC (who was previously in negotiations to purchase NCC) contacted NCC with a low-ball offer. While most acquisitions require a premium to be paid above the closing price of the share value, PNC recognized that NCC would not receive any financial assistance from TARP. Thus, PNC offered a 19 percent discount from NCC's closing price on Thursday, October 22, 2008. The Individual Defendants accepted the bid from PNC on October 23, 2008 – roughly 24 hours after PNC made the proposal.

80.     PNC agreed to purchase NCC for an aggregate $5.584 billion ($5.2 billion PNC stock for NCC common and preferred stock and $384 million in cash payable to certain NCC warrant holders – including Corsair). This plan values NCC common stock at $2.23 per share, or a 19 percent discount from NCC's closing price on Thursday, October 22, 2008 - $2.75 per share.

81.     PNC, if allowed to acquire NCC, will become the United States' fourth largest bank, behind Wells Fargo, Bank of America, and J.P. Morgan.

82.     In a letter to its employees dated October 24, 2008 and later filed with the SEC as a Form 425, PNC stated that the acquisition of NCC will benefit PNC substantially for a number of reasons, including:

(a)     The acquisition comes with an issuance of $7.7 billion of preferred stock to the government under TARP, which raises substantial capital for PNC well in excess of the amount paid for NCC,

(b)     NCC complements PNC's banking businesses and branches so that there will be minimal overlap and the combination of each company will create more value for PNC shareholders without any notable challenges,

(c)     The combined PNC and NCC network will expand PNC's customer base from the Midwest through the Mid-Atlantic and into Florida.

83.     These factors were known, or should have been known, to the Individual Defendants because of NCC's prior merger discussions and negotiations with PNC. The Individual Defendants haphazardly put NCC up for sale three times before eventually selling the Company in a panic, at a value which is substantially lower than a truly fair price for NCC.

**The Acquisition**

84.     The Acquisition was negotiated without any effort to maximize shareholder value. It was agreed to in furtherance of an unfair plan by the Individual Defendants to sell the Company, which, if not enjoined, will result in the improper elimination of the public stockholders of NCC in a transaction that is inherently unfair to them and that is the product of the Individual Defendants' conflicts of interest and breaches of fiduciary duties, as described herein.  More particularly, the transaction is in violation of the Individual Defendants' fiduciary duties and has been timed and structured unfairly in that:

(a)     The Acquisition is designed and intended to eliminate members of the Class as stockholders of the Company from continued equity participation in the Company for cash consideration, which the Individual Defendants know or should know is unfair and inadequate.

(b)     The Individual Defendants have unique knowledge of the Company and have access to information denied or unavailable to the Class.  Without all material information, Class members are unable to determine whether the price offered in the transaction is fair.

(c)     The Individual Defendants have violated their duty of fair dealing by manipulating the timing of the transaction to benefit themselves and/or other Company officers and directors at the expense of plaintiffs and the Class.

85.     The terms of the Acquisition will convert each share of NCC common stock into the right to receive 0.0392 shares of PNC common stock (the "Exchange Ratio"), which is unfair from a financial point of view.

86.     At the time the merger is consummated, all outstanding and unexercised employee and director options to purchase shares of NCC stock, common or any other kind, will vest and be converted automatically into options to purchase PNC common stock – subject to the Exchange Ratio. At the time that the Acquisition was announced, this equated to a value of $2.23 per share of National City stock. As of November 20, 2008, because PNC stock has fallen over $12 per share, the value of PNC stock each share of NCC stock will be exchanged for is only $1.75.

87.     From the date the merger is consummated, PNC agrees to indemnify and hold harmless, to the fullest extent permitted under applicable law, each present and former director, officer and employee of Company and its Subsidiaries against any costs or expenses, judgments, fines, losses, claims, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the date the merger is

23

consummated, including the transactions contemplated by this Agreement and the Option Agreement.

88.     The Individual Defendants concern over their own potential personal liability from outstanding securities and derivative lawsuits - stemming from their misconduct in leading NCC down the path to financial instability - had an influence over the Individual Defendants' decision to approve the unfair merger.

89.     Aware that the Individual Defendants could extinguish their liability in derivative suits through selling the Company, the Individual Defendants were more eager to pursue a buyer, even at a discounted price to an already undervalued NCC stock price.  In addition, the Individual Defendants ensured they would be covered from liability for at least the next six years by negotiating an indemnification clause in the Merger Agreement.  The indemnification clause indemnifies each Individual Defendant for six years for actions associated with the merger as well as indemnification for alleged malfeasance that occurred before the merger.  This indemnification lessens the Individual Defendants' fears of personal liability for their present and prior misdeeds.

90.     PNC agreed to keep such a broad indemnification for each current and former officer or director of NCC for a period of six years. This is suspicious because not only is six years well beyond most statute of limitations, but also because PNC is agreeing to indemnify *former* officers and directors of NCC, including the Company's former CEO, David A. Daberko. Daberko retired from NCC in December of 2007, when NCC stock was trading at just over $16 per share, less than half of what NCC was trading at only six months before - but over seven times the price NCC shares are being sold for to PNC under the terms of the Acquisition. Daberko received over $46 million dollars as he walked out of NCC's door, and both NCC and

the media later blamed Daberko's poor stewardship as the cause of NCC's current woes. Even so, less than a year after Daberko left NCC, the Defendants negotiated terms that indemnify Daberko for six years following the consummation of the merger.

91.     Defendants are engaging in self-dealing and not acting in good faith toward plaintiffs and the other members of the Class.  By reason of the foregoing, Defendants have breached and are breaching their fiduciary duties to the members of the Class.

92.     Goldman Sachs had a conflict of interest in that it had acted as financial advisor to PNC in a prior transaction.

93.     In connection with the Acquisition, Defendants agreed to merger terms that unreasonably hindered the possibility of a superior offer.  For example, PNC was granted an option to acquire 19.9% of NCC's common stock (the "Option Agreement") if the Acquisition is not completed.  Upon the occurrence of certain triggering events, NCC may be required to repurchase the option at a predetermined price, or PNC may choose to surrender the option to NCC for a cash payment of $168 million.  Under the terms of the Option Agreement, PNC could earn a profit of up to $224 million if the Acquisition is not completed.

94.     Because the Individual Defendants dominate and control the business and corporate affairs of NCC, and are in possession of private corporate information concerning NCC assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of NCC which makes it inherently unfair for them to pursue any proposed transaction wherein they and/or any third party will reap disproportionate benefits to the exclusion of maximizing stockholder value.

95.     As a result of the actions of the Individual Defendants, plaintiffs and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the

value of NCC assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

96.    Unless enjoined by this Court, Defendants will continue to breach their fiduciary duties owed to the Company, plaintiffs and the Class, and may consummate the Acquisition which will exclude the Class from its fair share of NCC valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Company and the Class, as aforesaid.

97.    Plaintiffs and the other members of the Class have an inadequate remedy at law.

**FIRST CLAIM FOR RELIEF**

**Class Claim for Violations of §14(a) of the Securities Exchange Act
Against All Defendants**

98.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

99.    Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14-A-9.

100.   In order to secure approval of the unfair Acquisition, Defendants filed a false and misleading Proxy with the SEC on November 24, 2008.  The Proxy misrepresented and/or omitted material information about the true value of the Company and the unfairness of the sales process. The Proxy contained numerous material omissions and misstatements, including those set forth below.

101.    There are at least two pending derivative lawsuits brought on behalf of the Company that expose Defendants (the directors) to a substantial likelihood of personal liability. Defendants made a number of statements in the Proxy that were rendered misleading by their failure to disclose their outstanding liability in the derivative lawsuits, including

(a)    The statements in the section entitled "Litigation Related to the Merger," as set forth on pages 72-73 of the Proxy.

(b)    The statements in the sections entitled "Interests of Our Directors and Executive Officers in the Merger," as set forth on pages 73-75 of the Proxy.

(c)    The statements in the section "Reasons for the Merger," as set forth on pages 46-48 of the Proxy.

102.    The omission from the Proxy of statements regarding Defendants' outstanding liability in the derivative lawsuits rendered the foregoing sections of the Proxy misleading because, absent disclosure of this information, NCC shareholders were not informed about the full extent of Defendants' interest in the Acquisition, their motives for undertaking the Acquisition, and the value of the Company's assets being transferred to PNC.

103.    In order to render the foregoing not misleading, Defendants should have expressly disclosed in the Proxy, at a minimum, (i) that Defendants were subject to liability in outstanding derivative lawsuits; (ii) the substance of the allegations in these lawsuits; (iii) that the Acquisition, if consummated, would extinguish this outstanding liability; (iv) that the Acquisition was undertaken, in part, to extinguish Defendants' derivative liability; and (v) that the outstanding derivative lawsuits are an asset of the Company that would pass to PNC upon consummation of the Acquisition.

104.    The foregoing was material because NCC shareholders are entitled to know the full extent of the interests of NCC's officers and directors in the Acquisition, Defendants' reasons for undertaking the Acquisition, and the extent of the Company's assets being transferred to PNC via the Acquisition.  If the true nature of the Individual Defendants' interests in the Acquisition related to the derivative suits were disclosed, a reasonable investor would find the information important in deciding whether to vote for or against the merger.

105.    In addition, Defendants made a number of statements in the Proxy that were rendered misleading because they failed to allow the shareholders to make an informed judgment about whether the Acquisition was fair price.  For example, the Proxy failed to disclose updated projections and Defendants did not allow Goldman Sachs to perform a customary analysis. Toward that end, the Proxy stated that Goldman Sachs "relied upon and assumed, without assuming any responsibility for independent verification, the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information provided to, discussed with or reviewed by it."   In addition, Goldman Sachs did not perform certain analyses that it customarily would have prepared for NCC in connection with a fairness opinion, because of the determination of NCC that such forecasts and analyses were not meaningful.

106.    The omission of updated or meaningful analyses rendered the Proxy materially misleading because absent disclosure of updated or meaningful analyses, shareholders were mislead into believing that the analysis actually reflected the most up-to-date financial information.

107.    Also, while the Proxy devotes several paragraphs to the due diligence performed by potential suitors of NCC, including PNC, throughout multiple sales attempts in 2008, the Proxy only briefly discusses the due diligence NCC conducted on PNC.  On pages 45-46 of the

Proxy, PNC and NCC declare that at some point after the 9:30 p.m. Board meeting ended on October 23, 2008, and prior to NCC's 6:00 a.m. Board meeting on October 24, 2008, Goldman Sachs and NCC began and completed due diligence on PNC. In a cash-for-stock merger, the Individual Defendants do not owe a strict duty to NCC shareholders to ensure that the acquiring company has a steady financial future. However in the case of a stock-for-stock merger, it is critical for the Board for the company being acquired to not only ensure that their shareholders receive a fair price for their stock (as determined by the monetary value of the acquiring company's stock prior to the deal's announcement), but also to ensure that the stock the company's shareholders will ultimately receive when the merger is completed is properly valued. With a transaction of this magnitude and importance, a proper due diligence could not have been properly and thoroughly completed - by both NCC management and Goldman Sachs - in (at most) eight hours through a single night. By making the statement in the Proxy that due diligence was undertaken and completed; Defendants are making a false and misleading declaration of material fact.

108.    In the exercise of reasonable care, Defendants should have known that the Proxy statement was materially false and misleading.

109.    The misrepresentations and omissions in the Proxy statement were material. The Proxy statement was an essential link in the accomplishment of the continuation of Defendants' scheme to effectuate the Acquisition on terms favorable to themselves and to the detriment of shareholders, as revelations of the truth would have immediately thwarted the Acquisition. Defendants were able to secure personal material benefits as a result of the approval of the Acquisition, including the extinguishment of liability in derivative suits, indemnification for prior and contemporaneous misconduct, the monetization of illiquid holdings in the Company,

continuing employment with PNC, and/or preferential financial treatment for their shares as compared to NCC's public shareholders, and direct payments.

110.    Defendants prepared, reviewed, disseminated, and/or caused to be disseminated, the false and misleading Proxy specified above which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  By virtue of their positions with the Company, Defendants were aware of this information and of their duty to disclose this information in the Proxy.

111.    In preparing, reviewing, and/or disseminating the Proxy, Defendants engaged in fraud, deceit, manipulation and/or contrivance.

112.    Plaintiffs and the members of the Class were damaged as a result of the material misrepresentations and omissions in the Proxy statement.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act
### Against NCC and the Individual Defendants

113.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

114.    The Individual Defendants acted as controlling persons of NCC within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of NCC, and their ownership of NCC stock, these Defendants had the power and authority to cause NCC to engage in the wrongful conduct complained of herein.  NCC controlled each of the Defendants and all of its employees.  By reason of such conduct, these Defendants are liable pursuant to §20(a) of the 1934 Act.

115.     As a direct and proximate result of these Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with ownership of NCC stock.

## THIRD CLAIM FOR RELIEF

### Class Claim for Breach of Fiduciary Duties
### Against All Defendants

116.     Plaintiffs repeat and reallege each allegation set forth herein.

117.     Defendants have knowingly or recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of NCC in bad faith by agreeing to sell the Company without taking steps to ensure that the stockholders would obtain adequate consideration; engineering the proposed transaction to benefit themselves and/or PNC without regard to NCC's public stockholders; agreeing to merger terms, including the Option Agreement, that unreasonably hinder the possibility of a superior offer; agreeing to the merger in an artificially short time period and without fully informing themselves as to whether the proposed merger provided fair and adequate value for NCC's stockholders; and failing to disclose material information regarding the transaction and the value of NCC.

118.     Defendants have knowingly or recklessly acted in bad faith to put their personal interests ahead of the interests of NCC shareholders.

119.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are attempting to unfairly deprive plaintiffs and other members of the Class of the true value of their investment in NCC.

120.    Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into a transaction with PNC without regard to the fairness of the transaction to NCC shareholders and by failing to disclose all material information concerning the Company's true value and/or the Acquisition to such shareholders.

121.    As demonstrated by the allegations above, Defendants knowingly or recklessly failed to exercise the care required and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of NCC because, among other reasons:

(a)    They failed to take steps to maximize the value of NCC to its public shareholders and they took steps to avoid competitive bidding, to cap the price of NCC stock and to give Defendants an unfair advantage by, among other things, failing to solicit other potential acquirers or alternative transactions;

(b)    They failed to properly value NCC;

(c)    They ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Acquisition; and

(d)    They have failed and are failing to disclose all material information that would permit NCC stockholders to properly evaluate their responses to the Acquisition.

122.    Because the Individual Defendants dominate and control the business and corporate affairs of Defendant NCC, and are in possession of private corporate information concerning NCC's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of NCC which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

123.    By reason of the foregoing acts, practices and course of conduct, Defendants have knowingly or recklessly and in bad faith failed to exercise care and diligence in the exercise of their fiduciary obligations toward the Company, plaintiffs and the other members of the Class.

124.    In light of the foregoing, Plaintiffs demand that the Individual Defendants, as their fiduciary obligations require, immediately:

o        Undertake an independent evaluation of NCC's worth as an acquisition candidate.

o        Rescind any and all provisions that inhibit the maximization of shareholder value.

o        Implement an active auction or open bidding process in order to maximize shareholder value.

o        Retain independent advisors and appoint a truly independent committee so that the interests of NCC's public stockholders will be protected and any subsequent offers will be considered and negotiated in the interest of NCC's public stockholders.

125.    Unless enjoined by this Court, Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to the Company, plaintiffs and the Class, and may consummate the Acquisition which will exclude the Class from its fair share of NCC valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Company and the Class.

126.    Defendants are engaging in self dealing, are not acting in good faith toward plaintiffs and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties owed to the Company and members of the Class.

127.    As a result of Defendants' unlawful actions, plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of NCC assets and businesses and will be prevented from obtaining the real value of their equity

33

ownership of the Company.  Unless the Acquisition is enjoined by the Court, Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to the Company, plaintiffs and the other members of the Class, will not engage in arm's-length negotiations on the Acquisition terms, and will not supply to NCC minority stockholders sufficient information to enable them to cast informed votes on the Acquisition and may consummate the Acquisition, all to the irreparable harm to the Company and members of the Class.

128.    Plaintiffs and the other members of the Class have an inadequate remedy at law. Only through the exercise of this Court's equitable powers can the Company, plaintiffs and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand injunctive relief, in plaintiffs' favor and in favor of the Class and against Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action;

B.    Declaring and decreeing that the Acquisition and/or Merger Agreement was entered into in breach of the fiduciary duties of Defendants and is therefore unlawful and unenforceable;

C.    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders;

D.    Directing Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interest of NCC shareholders until the process for the sale or auction of the Company is completed and the highest possible price is obtained;

E.      Rescinding, to the extent already implemented, the Acquisition or any of the terms thereof;

F.      Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  November 26, 2008

WILLIAM J. LUCAS, LPA
WILLIAM J. LUCAS


s/William J. Lucas
WILLIAM J. LUCAS (0008268)
1360 West 9th Street #200
Cleveland, Ohio 44113
Telephone:  216-771-8340
216-522-9007 (fax)
lucaslpa@hotmail.com


JOHNSON BOTTINI, LLP
FRANK J. JOHNSON
FRANCIS A. BOTTINI, JR.
DEREK J. WILON
655 W. Broadway, Suite 1400
San Diego, CA 92101
Telephone:  (619) 230-0063
(619) 233-5355 (fax)

Attorneys for Plaintiffs

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

We, James and Caroline Tharp (husband and wife), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      We have reviewed the complaint with our counsel and authorize its filing.

2.      We currently own or control 252,304 shares of National City Corporation and have owned this number of shares during all times mentioned in the complaint. We did not acquire the shares of National City Corporation at the direction of Johnson Bottini LLP or in order to participate in any private action under the federal securities laws.

3.      We are willing to serve as lead plaintiff. We understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      We will not accept any payment for serving as a representative party beyond our pro rata share of any recovery, except reasonable costs and expenses - such as lost wages and travel expenses - directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      We have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      We understand that this is not a claim form, and that our ability to share in any recovery as a class member is not affected by our decision to serve as a representative party.

We declare under the laws of the United States of American and penalty of perjury that the foregoing is true and correct. Executed this _25th_ day of November, 2008.

_James A. Tharp_
James A. Tharp

_Caroline M Tharp_
Caroline M. Tharp